**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

CHARLIE J. SCOTT,

Plaintiff,

v. 9:23-CV-770 (AJB/DJS)

SGT. A. GIFFORD, *et al.*,

Defendants.

---

**APPEARANCES:** **OF COUNSEL:**

CHARLIE J. SCOTT
Plaintiff, *Pro Se*
07-A-3560
Five Points Correctional Facility
Caller Box 119
Romulus, New York 14541

HON. LETITIA JAMES
New York State Attorney General
*Attorney for Defendants, Sgt. Gifford, C.O. Jayne, and C.O. Cuddeback*
The Capitol
Albany, New York 12224

M. RANDOLPH BELKIN, ESQ.
Assistant Attorney General

**DANIEL J. STEWART**
**United States Magistrate Judge**

## REPORT-RECOMMENDATION AND ORDER[1]

Presently before the Court is the Motion for Summary Judgment filed by Defendants Sgt. Andrej Gifford ("Sgt. Gifford"), C.O. Jeven Jayne ("C.O. Jayne"), and

---

[1] This matter was referred to the undersigned for a report-recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

C.O. Jamie Cuddeback ("C.O. Cuddeback," and collectively with Sgt. Gifford and C.O. Jayne, "Defendants"). Dkt. Nos. 68-81 & 96-97. *Pro se* Plaintiff Charlie J. Scott ("Plaintiff") opposes Defendants' Motion for Summary Judgment and makes a Cross Motion for Summary Judgment. Dkt. No. 95; *see also* Dkt. No. 99. For the reasons set forth below, the Court recommends that Defendants' Motion be **GRANTED IN PART AND DENIED IN PART** and that Plaintiff's Cross Motion be **DENIED**.

## I. FACTUAL BACKGROUND

On June 26, 2023, Plaintiff commenced this action pursuant to 42 U.S.C. § 1983 and the Religious Land Use and Institutionalized Persons Act alleging that his federal constitutional rights were violated while he was incarcerated in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS") and held at Auburn Correctional Facility ("Auburn"). Dkt. No. 1, Compl. On July 29, 2024, Plaintiff filed an Amended Complaint. Dkt. No. 22, Am. Compl.[2]

According to the Amended Complaint, on June 13, 2022, Plaintiff and "the entire Yoruba/Santeria congregation" were "denied the opportunity to . . . worship the holy day of Eleggua, Saint Anthony." Am. Compl. at p. 4. Sgt. Gifford allegedly "noticed" Plaintiff and "the other practi[t]oners wearing the mandated and necessary Elekes (Orisha Beads) around [their] neck[s]." *Id.* Sgt. Gifford allegedly told them that they "will not be doing devil magic here in his prison." *Id.* The Amended Complaint further

[2] Citations to Plaintiff's Complaint and Amended Complaint are to page numbers provided by the Court's CM/ECF system.

alleges that Sgt. Gifford was shown the "[h]oly day calendar," and responded "[y]ou can only wear three (3) of them beads when your outta your cell," and threatened that, if he saw Plaintiff or any of the other practitioners "with more than three (3) beads on," he would "make [their] stay here at [Auburn] hell." *Id.*

The Amended Complaint alleges that Sgt. Gifford then went to Plaintiff's housing block and next to Plaintiff's name on the "[m]asterboard" wrote "keeplock," which "is the term used to confine an [i]ncarcerated person to their cell, without first being written a misbehavior report." *Id.* Plaintiff was allegedly on "keeplocked status . . . for seven (7) days." *Id.* During that time, Plaintiff alleges that he "went without . . . [p]lumbing, [r]unning water, [p]ower, food, commissary, recreation, phones, laundry, or cleaning supplies." *Id.*

On June 18, 2022, Plaintiff alleges that he filed a grievance against Sgt. Gifford. *Id.* at p. 5; Dkt. No. 73 at p. 1. The June 18 grievance discusses the aforementioned denial of worship on June 13, Sgt. Gifford's comments related to "devil magic" and the number of bead necklaces permitted, and Sgt. Gifford's "[u]s[e of] torture tactics such as: 1) turning the water and plumbing off in the cell [Plaintiff] inhibits, 2) turning[] off the power to [Plaintiff's] cell, 3) not allowing [Plaintiff] to go to recreation, use the phone[,] or go to the messhall and eat." Dkt. No. 73 at p. 1. While Plaintiff awaited a response to the grievance, Sgt. Gifford and C.O. Jayne allegedly came to Plaintiff's cell "waving a copy of [Plaintiff's] grievance" and "calling [him] a '[s]nitch.'" Am. Compl. at p. 5.

The Amended Complaint alleges that, thereafter, on June 21 and 23, 2022, C.O. Cuddeback "harassed [Plaintiff] about wearing his religious beads." *Id.* On June 25, 2022, Plaintiff alleges that he filed a second grievance, this time against C.O. Cuddeback, and included a copy of his June 18 grievance against Sgt. Gifford. *Id.* at p. 6; Dkt. No. 73 at p. 13. The June 25 grievance discusses Plaintiff's interactions with C.O. Cuddeback on June 21 and June 23 regarding his religious beads. Dkt. No. 73 at p. 13.

On June 27, 2022, Plaintiff's "running water, plumbing, [and] power[]" were allegedly "turned off by correction staff." Am. Compl. at p. 6. According to the Amended Complaint, at Sgt. Gifford's "direction," and in order to "punish" Plaintiff "for writing to the central office of DOCCS," Plaintiff went eight days "without power, running water, plumbing[,] showers, 24 stated provided meals, recreation, phone use, cleaning supplies[, and] laundry." *Id.*

On July 5, 2022, which was Plaintiff's "first day outta [sic] his cell in (8) days," C.O. Cuddeback allegedly stopped and frisked Plaintiff, and told Plaintiff to "either take the beads off, or go back to [his cell]." Am. Compl. at pp. 6-7. Plaintiff returned to his cell, and was "confined" there "for another week, with no power, plumbing, running water, showers, laundry, cleaning supplies[,] phone[,] or kiosk." *Id.* at p. 7. During that time, Plaintiff received a misbehavior report written by C.O. Cuddeback dated July 5, 2022. *Id.*; Dkt. No. 75, Parmiter Decl. at Ex. B p. 3 (disciplinary incident summary listing incident on July 5 reported by C.O. Cuddeback).

On July 13, 2022, Plaintiff allegedly filed another grievance. Am. Compl. at p. 8; Dkt. No. 73 at pp. 20-21. The next day, on July 14, 2022, C.O. Jayne issued a misbehavior report against Plaintiff. Compl. at p. 78; Dkt. No. 95-6 at p. 1; Parmiter Decl. at Ex. B p. 3 (disciplinary incident summary listing incident on July 14 reported by C.O. Jayne).

Defendants dispute that much of this conduct occurred. Dkt. No. 76, Gifford Decl.; Dkt. No. 77, Cuddeback Decl.; Dkt. No. 78, Jayne Decl. Sgt. Gifford rejects Plaintiff's assertion that he denied Plaintiff and the Yoruba/Santeria congregation the opportunity to "observe the holy day of Eleggua/St. Anthony's Day on June 13, 2022." Gifford Decl. at ¶ 7. He also asserts he "never confined [P]laintiff to his cell nor ha[s] [he] ever directed others to," and "never deprived Plaintiff or directed others to deprive him of power, running water, access to showers, recreation, telephone, laundry, and cleaning supplies, nor to miss 24 meals." *Id.* at ¶ 8. C.O. Cuddeback and C.O. Jayne deny that they issued misbehavior reports to Plaintiff in retaliation for Plaintiff filing a grievance against Sgt. Gifford. Cuddeback Decl. at ¶ 3; Jayne Decl. at ¶ 3.

## II. PROCEDURAL HISTORY

On August 18, 2023, the District Court reviewed the Complaint for sufficiency and determined that only Plaintiff's First Amendment free exercise claim against Sgt. Gifford and First Amendment retaliation claim against C.O. Cuddeback survived *sua sponte* review and required a response. Dkt. No. 7. Specifically, the District Court construed the Complaint as stating a First Amendment free exercise claim against Sgt.

Gifford based on him "refus[ing] to allow [Plaintiff] to observe the holy day of Eleggua," *id.* at p. 16, and permitted this claim to proceed. *Id.* at pp. 17 & 30. The District Court reached a different finding as to and dismissed Plaintiff's "remaining free exercise claims," including his assertion that certain individuals "used [a] policy that limited the number of beads that an inmate could wear to harass [P]laintiff." *Id.* at pp. 16-17. Additionally, the District Court construed the Complaint as stating a First Amendment retaliation claim, but only against C.O. Cuddeback based on Plaintiff's claim "that the July 5, 2022 misbehavior report" "issued by Cuddeback" "'was a retaliatory asset of C.O. Cuddeback and Sgt. Gifford.'" *Id.* at pp. 21-23 (quoting Compl. at p. 14).

On September 9, 2024, the District Court reviewed the Amended Complaint and determined that, in addition to the aforementioned claims contained in the Complaint that were permitted to proceed, the Amended Complaint also sufficiently pled an Eighth Amendment conditions-of-confinement claim against Sgt. Gifford and First Amendment retaliation claims against Sgt. Gifford and C.O. Jayne. Dkt. No. 25. In particular, the District Court found that the Amended Complaint stated an Eighth Amendment conditions-of-confinement claim against Sgt. Gifford stemming from two incidents of deprivation. *Id.* at p. 9. The first is based on Plaintiff's assertion "that Gifford was responsible for placing him on keeplock status" and confined to his cell "for seven days" beginning on June 13, 2022 "without running water, power, food, commissary, telephone privileges, laundry services, or cleaning supplies." *Id.* at pp. 3

& 9 (citing Am. Compl. at pp. 4 & 6). The second arises from Plaintiff's assertion "that Gifford was responsible for [P]laintiff's eight-day confinement beginning on June 27, 2022," which left Plaintiff "without power, running water, access to showers, recreation, telephone, laundry, and cleaning supplies" and involved Plaintiff allegedly missing 24 meals. *Id.* at p. 9 (citing Am. Compl. at pp. 4 & 6). In addition, the District Court found that the Amended Complaint stated First Amendment retaliation claims against Sgt. Gifford and C.O. Jayne stemming from Plaintiff's allegations that: "Gifford and Jayne came to his cell 'waving' a copy of his grievance against Gifford," *id.* at p. 10 (quoting Am. Compl. at p. 5); "Gifford retaliated against [P]laintiff for filing a grievance against Gifford when he directed staff to confine plaintiff to his cell for eight days in June 2022," *id.* (citing Am. Compl. at p. 6); and "Jayne issued a misbehavior report in July 2022 in retaliation for the grievance against Gifford." *Id.* (citing Compl. at p. 78).

## III. LEGAL STANDARD FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56(a), summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial and cannot rest merely on allegations or denials of the facts submitted by the movant. FED. R. CIV. P. 56(c); *see also Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525-26 (2d Cir. 1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard . . . they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin*, 344 F.3d at 289 (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) and *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995)).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir. 1998). In considering a summary judgment motion, the court's role "is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994). "Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Id.* Furthermore, where a party is proceeding *pro se*, the court must "read [his or her] supporting papers liberally, and . . . interpret them to raise

the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). Nonetheless, summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## IV. DISCUSSION

### A. Exhaustion of Administrative Remedies

#### *1. Exhaustion Procedure*

The Prison Litigation Reform Act ("PLRA") provides, in pertinent part, that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The Supreme Court has held that "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002) (citation omitted). Exhaustion in prisoner cases covered by § 1997e(a) is mandatory. *Id.* at 524; *see also Ross v. Blake*, 578 U.S. 632, 638 (2016) (stating that the mandatory language of § 1997e(a) forecloses judicial discretion to craft exceptions to the requirement). Furthermore, § 1997e(a) requires "proper exhaustion," which means using all steps of the administrative process and complying with "deadlines and other critical procedural rules." *Woodford v. Ngo*, 548 U.S. 81, 93 (2006). The defendant bears the burden of proving that the

administrative remedies available to the plaintiff were not exhausted prior to the initiation of a civil action. *Howard v. Goord*, 1999 WL 1288679, at *3 (E.D.N.Y. Dec. 28, 1999).

In New York, the administrative remedies consist of a three-step Incarcerated Grievance Program ("IGP"). First, a grievance is submitted to the Incarcerated Grievance Resolution Committee ("IGRC"), a committee comprised of both inmates and facility employees. N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5(b). An inmate must submit a grievance "within 21 calendar days of an alleged occurrence." *Id.* at § 701.5(a)(1). An inmate may request an extension of the time limit within forty-five days of the date of the alleged occurrence. *Id.* at § 701.6(g). The IGRC reviews and investigates the formal complaint and then issues a written determination. *Id.* at § 701.5(b). Second, upon appeal of the IGRC decision, the superintendent of the facility reviews the IGRC's determination and issues a decision. *Id.* at § 701.5(c). Finally, upon appeal of the superintendent's decision, the Central Office Review Committee ("CORC") makes the final administrative determination. *Id.* at § 701.5(d). Only upon exhaustion of all three levels of review may a prisoner seek relief in federal court. *Bridgeforth v. Bartlett*, 686 F. Supp. 2d 238, 239 (W.D.N.Y. 2010) (citing, *inter alia*, *Porter v. Nussle*, 534 U.S. at 524); *see also Neal v. Goord*, 267 F.3d 116, 121 (2d Cir. 2001), *overruled on other grounds by Porter v. Nussle*, 534 U.S. 516.

*2. The Record Regarding Exhaustion*

The record regarding exhaustion is confusing at best. Plaintiff offers evidence of at least six grievances submitted at Auburn Correctional Facility.

<u>a. Grievance AUB 633-02</u>

DOCCS records reflect that two of Plaintiff's grievances, dated June 18 and June 25, were filed and combined as Grievance AUB 633-02. Parmiter Decl. at ¶ 13 & Ex. B. That grievance spoke at length about Plaintiff's claims that he was being harassed because of his religious beliefs, including him being prevented from worshipping the holy day of Saint Anthony/Eleggua and his wearing of religious beads, and discussed allegations that water and power were turned off in his cell and he was not permitted "to go to recreation, use the phone[,] or go to the messhall and eat" in an effort to harass him for his exercise of his religion. *Id.* at Ex. B pp. 11-13. The events discussed in the grievance were alleged to have taken place between June 13 and June 23. *Id.* Religious discrimination and conditions within a cell are both matters that are subject to the grievance process. *See id.* at ¶¶ 5-6.

Plaintiff's grievance, however, was dismissed by the IGRC as presenting a non-grievable question. *Id.* at ¶ 14. The decision explained that the grievance sought relief otherwise available through the disciplinary process and thus was not grievable. *Id.* Under DOCCS policy, Plaintiff's remedy in that situation was to challenge the dismissal to the Inmate Grievance Supervisor. 7 N.Y.C.R.R. § 701.5(b)(4)(iii). Plaintiff did so and his appeal was denied. Parmiter Decl. at Ex. B pp. 2 & 4-8. Following this

"Plaintiff's recourse would have been to file a separate grievance for improper process of grievance, which allows the Superintendent or CORC to reopen the previous grievance." *Henderson v. Jones*, 2026 WL 788097, at *3 (N.D.N.Y. Mar. 20, 2026) (internal quotation and citations omitted). Plaintiff did not do so and so the grievance would normally be deemed unexhausted.

Two factors, however, suggest that questions of fact exist that should preclude dismissal of claims related to these grievances. A prisoner's failure to exhaust administrative remedies may be excused if remedies were unavailable to the inmate. *Ross v. Blake*, 578 U.S. at 642. As the Supreme Court stated in *Ross*, "[a]n inmate . . . must exhaust available remedies, but need not exhaust unavailable ones." *Id.* The Court provided three potential circumstances in which administrative remedies may be unavailable: (1) where the administrative procedure technically exists but operates as a "dead end - with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) where the administrative scheme is "so opaque that it becomes, practically speaking, incapable of use"; and (3) where prison administrators "thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 643-44.

Here, it is entirely unclear how the grievance at issue was deemed to relate to a non-grievable disciplinary matter, rather than the religious and confinement issues discussed at length in the grievance. While the record does show that Plaintiff was eventually given a misbehavior report for unauthorized religious garments, Parmiter

Decl. at Ex. B p. 10; Cuddeback Decl. at Ex. A, that was well after the events described in the grievance and the grievance makes no reference to the misbehavior report. Parmiter Decl. at Ex. B pp. 11-13; Dkt. No. 72, Pl.'s Dep. at 56:5-20 & 62:9-14. Defendants themselves argue that the grievances predate the misbehavior report. Dkt. No. 80, Defs.' Mem. of Law at p. 14. The grievance also appears to initially have been coded as a religion grievance relating to Plaintiff's "right to wear beads." Parmiter Decl. at Ex. A; *see also* Pl.'s Dep. at 75:10-24. That creates a question in the Court's mind about whether the grievance process may have mispresented the nature of the grievances to Plaintiff's detriment here.

And while the ability to file a grievance challenging the improper designation of grievance AUB 633-02 may have afforded Plaintiff sufficient relief, it may be that he was confused by later events with respect to this grievance. On October 3, more than a month after his attempts to appeal the dismissal of AUB 633-22 had been denied, Plaintiff received a letter from DOCCS Central Office advising that as of that date "the Incarcerated Grievance Resolution Committee hearing is pending" regarding that very same grievance. Dkt. No. 73-1 at p. 16. It does not appear that this was an accurate statement, but one that certainly may have caused confusion with Plaintiff regarding the processing of this grievance.

In sum, the Court finds questions of fact exist as to whether an exception applies to excuse the failure to fully exhaust grievance AUB 633-02.

b. Unfiled Grievances

Plaintiff offers evidence of several additional grievances he claims to have filed, but which were not processed by DOCCS. Dkt. No. 73 at pp. 19-26. Defendants contend that none of these grievances were filed with the IRGC. Parmiter Decl. at ¶ 20. DOCCS' records reflect only three grievances total having been filed by Plaintiff while at Auburn. *Id.* at ¶ 13 & Ex. A. They further reflect no appeal to CORC of any grievance from Auburn. Dkt. No. 74, Seguin Decl. at Ex. A.

In general, this Court has viewed claims that grievances have been submitted, but not filed, with skepticism when they amounted to purely conclusory assertions on the part of the plaintiff. *See*, *e.g.*, *Gough v. Morris*, 2018 WL 7199494, at *4 (N.D.N.Y. Dec. 14, 2018), *report and recommendation adopted*, 2019 WL 416150 (N.D.N.Y. Feb. 1, 2019). This case, however, is different in that Plaintiff

> has offered what he purports to be the grievances he filed in opposition to the Motion. He also offers additional correspondence he maintains was submitted to grievance officials at the facility inquiring about the status of the grievances and asking, based on the purported lack of a response, that the grievances be moved to the next step in the administrative process. These documents do not establish that they were in fact filed with correctional staff, but they are sufficient at the very least to raise a question of fact about whether Plaintiff sought to and was in some way prevented from utilizing the grievance process. This case is different in that regard from others where a plaintiff made a purely conclusory allegation that he had filed grievances, with no documentary proof.

*Croney v. Medbury*, 2024 WL 5294279, at *4 (N.D.N.Y. Nov. 12, 2024), *report and recommendation adopted sub nom. Croney v. Medburry*, 2024 WL 4986160 (N.D.N.Y. Dec. 5, 2024) (internal citations omitted).

After claiming to file these grievances and not being provided grievance numbers, Plaintiff inquired of the grievance staff at Auburn. He wrote a letter dated August 8 purporting to attach all of his previously submitted grievances. Dkt. No. 73-1 at pp. 2-5. On August 12, the Superintendent's Office acknowledged receipt of the letter and referred it to the IGP. Dkt. No. 95-5 at p. 20. Parmiter, the IGP Supervisor, thereafter acknowledged receipt of the letter and noted that it "attached grievance complaints." *Id.* at p. 23; Dkt. No. 73-1 at p. 6. She went on to explain that the "[t]he 1st and 2nd of these complaints were logged as AUB-0633-22, which is pending an IGRC response. *The rest of the complaints* I am not in receipt of." Dkt. Nos. 73-1 at p. 6 & 95-5 at p. 20 (emphasis added). Clearly as of August 15, the date of Parmiter's response to Plaintiff, she was in receipt of some additional grievances that Plaintiff claimed he had filed. There is no explanation in the record, however, of what happened to those other complaints. They were not filed as grievances clearly, but no explanation is given as to why not. That raises serious questions about the availability of the grievance process with respect to those complaints.

The same is true of Plaintiff's letter dated August 23 entitled "grievance appeal," wherein Plaintiff recounted each of the grievances he filed to date. Parmiter Decl. at Ex. B p. 5. Specifically, Plaintiff stated: "On 6/18/22 I submitted my 1st grievance. On 6/25/22 I submitted my 2nd grievance. On 7/1/22 I submitted my 3rd grievance. On 7/13/22, 7/14/22, & 7/20/22 I submitted my 4th[,] 5th[,] & 6th grievances concerning the violations of my rights with exhibits." *Id.* at pp. 5-6. Notably, Plaintiff's August 23

letter recounting the grievances that Plaintiff states he filed matches up in date with the copies of grievances filed by Plaintiff in this lawsuit. *Compare id.* at pp. 5-6 (grievance packet filed by Defendants containing Plaintiff's August 23 letter recounting grievances filed by Plaintiff) *with* Dkt. No. 73 (document filed by Plaintiff containing copies of grievances he claims to have filed).

And there is more. Plaintiff has attached to his opposition several letters addressed to CORC. *See generally* Dkt. Nos. 95-5 at pp. 18-19 & 95-8 at pp. 46-47. One of these letters, which is dated September 8, Dkt. No. 95-8 at pp. 46-47; *see also* Pl.'s Dep. at 90:9-11, was discussed at Plaintiff's deposition. *See generally* Pl.'s Dep. at 89:6-90:18. Plaintiff testified at his deposition that the September 8 letter was his first formal appeal to CORC in this matter, *id.* at 90:13-18, and enclosed with it were all seven of his grievances. *Id.* at 89:9-21. The September 8 letter itself recounts how, "on June 18th, 2022, [Plaintiff] submitted [his] 1st grievance" and ultimately submitted "6 overall grievances from June 18th, 2022 through July 31st, 2022." Dkt. No. 95-8 at p. 46. Further, the September 8 letter states that Plaintiff had "prepared and mailed this letter to appeal the denials of both grievance committee and superintendent plus IGP Parmiter." *Id.* at p. 47.

A later letter addressed to CORC, which is dated November 10, states that "[i]n early October [Plaintiff] submitted a grievance 'pack' to this office in response to a superintendent's denial [and] dismissal of a grievance # AUB 0633-22," and reports that Plaintiff did not receive a response. Dkt. No. 95-5 at p. 18. The November 10 letter

also notes Plaintiff's change of address to Five Points Correctional Facility ("Five Points"). *Id.* Another letter is dated November 14, 2022, and states:

> On July 29, 2022, while housed at Auburn CF, I submitted the enclosed grievance. At no time from then until now was this grievance given a filing # as is policy. . . I've appealed this to the facility superintendent with no reply. I've been transferred to [Five Points] . . . I'm appealing to CORC.

*Id.* at p. 19. Like the letter from November 10, the letter from November 14 contains Plaintiff's address at Five Points and notes that he had been transferred there. *Id.* Defendants largely fail to address these letters, and instead argue, in conclusory fashion, that "[t]he exhibits [Plaintiff] attaches to his Declaration do not create a genuine issue of fact as to whether any appeals were filed with CORC." Dkt. No. 96-1 at p. 5.

"Viewed in the light most favorable to the nonmovant on this Motion, Plaintiff has raised a factual question as to the processing and/or the availability of the grievance process to him under the particular factual circumstances presented." *Moorer v. Matthie*, 2026 WL 1288257, at *4 (N.D.N.Y. Apr. 9, 2026) (citing cases), *report and recommendation adopted*, 2026 WL 1286867 (N.D.N.Y. May 8, 2026). Because "a genuine dispute of material fact exists regarding whether Plaintiff exhausted his administrative remedies," it is "recommend[ed] that the Court conduct an exhaustion hearing pursuant to *Messa v. Goord*, 652 F.3d 305 (2d Cir. 2011) to determine whether Plaintiff properly exhausted his administrative remedies." *Harlow v. Brown*, 2026 WL

1991660, at *7 (N.D.N.Y. May 21, 2026), *report and recommendation adopted sub nom. Harlow v. Brown*, 2026 WL 1803017 (N.D.N.Y. June 23, 2026).[3]

**B. Merits**

*1. Free Exercise Claim against Sgt. Gifford*

Defendants dispute the merits of Plaintiff's free exercise claim, Defs.' Mem. of Law at pp. 17-19, and contend that, while this claim is based on Sgt. Gifford allegedly "refus[ing] to allow the Yoruba/Santeria congregation at Auburn," including Plaintiff, "to worship on June 13, 2022," "there was no organized prayer coordinated to be held" on that date. *Id.* at p. 18. Rather, Defendants assert that "the festival Plaintiff complains he was not permitted to participate in . . . occur[red] the day before." *Id.* Defendants also note that Plaintiff only believed "a festival was . . . scheduled to take place on June 13, 2022" because "a festival took place on June 13, 2021 (the prior year)," and point out that "religious festivals at Auburn only occur on Saturdays or Sundays, whereas June 13, 2022, fell on a Monday." *Id.*

In support, Defendants attach DOCCS' religious holy day calendar for 2022, which states that, for the Santeria religion, Saint Anthony/Eleggua occurs on June 13, 2022. Gifford Decl. at ¶¶ 4-5 & Ex. A p. 43; Dkt. No. 79, Muhsen Decl. at ¶¶ 4-5 & Ex. A p. 43. Defendants also attach a to/from memorandum indicating that "Santeria Saint Anthony – Elggua" would be celebrated at Auburn on Sunday, June 12, 2022, as well

[3] The parties have not addressed the potential relevance of *Perttu v. Richards*, 605 U.S. 460 (2025) to this matter.

as a list stating that Plaintiff was scheduled to partake in the event. Gifford Decl. at ¶¶ 4 & 6 & Ex. B; Muhsen Decl. at ¶¶ 4 & 6 & Ex. B.

In response, Plaintiff provides copies of the religious holy day calendar for 2018, 2022, and 2025, each of which show that, for the Santeria religion, Saint Anthony/Eleggua occurs on June 13. Dkt. No. 95-5 at pp. 1-6. The calendars also state that the "[d]ates are the same every year." *Id.* This evidence alone does not, however, refute the to/from memorandum provided by Defendants indicating on what date Auburn would actually celebrate that holiday.

In any event, the inconsistency between Plaintiff and Defendants as to the date on which Auburn held an event for the Santeria religion in celebration of Saint Anthony/Eleggua is not material for purposes of Defendants' Motion. In *Cole v. Levitt*, like here, the plaintiff alleged that the defendant "refused to permit him to attend a religious service," the defendant "argue[d] that this claim is meritless," and the parties disputed, among other things, the date of the religious event at issue. 2009 WL 4571828, at *14 (W.D.N.Y. Dec. 4, 2009). The court held that, "[b]ased upon the conflicting accounts of what occurred" on the relevant date "and whether other inmates were permitted to attend [holy day] services on that date, . . . plaintiff ha[d] raised a triable issue of fact." *Id.*; *see also Jackson v. Downstate Corr. Facility*, 2018 WL 3650136, at *2 n.3 (S.D.N.Y. July 31, 2018) (holding that the inconsistency between the parties as to the date plaintiff drafted a grievance was "immaterial for purposes of th[e] motion," and noting that, in any event, "[p]laintiff insist[ed] that he filed this grievance," and "it

is possible he got the dates wrong, or wrote the wrong date on the grievance"). Regardless of whether the celebration of Saint Anthony/Eleggua occurred on June 13, as Plaintiff alleges, or on June 12, as Defendants allege, Plaintiff insists that Sgt. Gifford prevented him and "the entire Yoruba/Santeria congregation" from "worship[ing] the holy day." Am. Compl. at p. 4. Furthermore, Sgt. Gifford's assertion that he "did not refuse to allow the entire Yoruba/Santeria congregation to observe the holiday day of Eleggua/St.Anthony's Day on June 13, 2022," Gifford Decl. at ¶ 7, is insufficient at this stage to resolve this issue of material fact.

The Court, therefore, recommends that Defendants' Motion be denied to the extent that it seeks summary judgment dismissing Plaintiff's First Amendment free exercise claim against Sgt. Gifford.

*2. Conditions-of-Confinement Claim against Sgt. Gifford*

Defendants also challenge the merits of Plaintiff's conditions-of-confinement claim. Defs.' Mem. of Law at pp. 19-20. Significantly, while Defendants recite the standard for assessing an Eighth Amendment conditions-of-confinement claim, *id.* at p. 19, they do not argue that Plaintiff fails to satisfy either the objective or subjective test. *See generally id.* at pp. 19-20. Instead, Defendants rely on Sgt. Gifford's declaration to support their assertion that Sgt. Gifford:

> did not confine the Plaintiff to his cell for seven days starting on June 13, 2022, without running water, power, food, commissary, telephone privileges, laundry services, or cleaning supplies and did not confine him again for eight days starting on June 27, 2022, without power, running

> water, access to showers, recreation, telephone, laundry, and cleaning supplies, nor cause him to miss 24 meals.

Defs.' Mem. of Law at p. 20 (citing Gifford Decl. at ¶¶ 2 & 8).

However, that Sgt. Gifford denies Plaintiff's claims is insufficient to warrant the granting of summary judgment in Defendants' favor. It simply establishes that there is a genuine dispute of material fact as to whether Sgt. Gifford subjected Plaintiff to the conditions-of-confinement that Plaintiff alleges, which requires a credibility determination that the Court cannot appropriately resolve and precludes summary judgment. *See*, *e.g.*, *Harlow v. St. Andrews*, 2020 WL 5834219, at *6 (N.D.N.Y. Oct. 1, 2020); *Daum v. Racette*, 2018 WL 7291421, at *11 (N.D.N.Y. Nov. 5, 2018), *report and recommendation adopted*, 2019 WL 610385 (N.D.N.Y. Feb. 13, 2019).

Defendants also argue that Plaintiff "has a fundamental lack of personal knowledge as to who allegedly confined him in the manner he claims." Defs.' Mem. of Law at p. 20. Yet, this is contrary to Plaintiff's continued position that his "condition of confinement . . . was caused by . . . Sgt. Gifford." Dkt. No. 95-4, Pl.'s Opp. at p. 5. Furthermore, Plaintiff supports his position that Sgt. Gifford is responsible for the conditions-of-confinement that Plaintiff suffered. Specifically, Plaintiff notes that those conditions "occurred hours after [P]laintiff had a conversation with Sgt. Gifford," Pl.'s Opp. at p. 5, and that, following their conversation, Sgt. Gifford went to Plaintiff's housing block and next to Plaintiff's name on the "[m]asterboard" wrote "keeplock" "to confine" him to his cell. Am. Compl. at p. 4. Plaintiff contends that he was kept on

"keeplocked status . . . for seven (7) days," during which he "went without . . . [p]lumbing, [r]unning water, [p]ower, food, commissary, recreation, phones, laundry, or cleaning supplies." *Id.* Plaintiff also asserts that Sgt. "Gifford had his officer(s) open the cat-walk so as to go behind [Plaintiff's] cell and shut off [his] water and electricity," and that he "know[s] this based upon [his] personal observation by looking through the ventilation holes on the back wall of [his] cell." Dkt. No. 95-3 at ¶ 16; *see also* Pl.'s Opp. at p. 6. Plaintiff further alleges that he was later informed by other officers that he was on "the burn . . . per Sgt. Gifford," which Plaintiff describes as "an unwritten common practice which corrections staff officials temporarily deprive incarcerated individuals of certain rights and privileges . . . to arbitrarily punish incarcerated individuals," Dkt. No. 73 at p. 22, and thus contends that Sgt. Gifford directed other officers to subject Plaintiff to the conditions-of-confinement alleged. Pl.'s Opp. at p. 5. Those allegations are sufficient to withstand summary judgment.

Finally, while Defendants assert that Plaintiff "conceded that he was not deprived of food and drink for a collective fifteen days," Defs.' Mem. of Law at p. 20 (citing Pl.'s Dep. at 107:23-108:3), their only support for that is Plaintiff's statement at his deposition that he "had other I.I.s next door to [him] who furnished [him] with food and drink," but as Plaintiff stated at his deposition, that "doesn't take away the stuff that [he is] supposed to be provided" by Defendants. Pl.'s Dep. at 106:23-107:4.

The Court, therefore, recommends that Defendants' Motion be denied to the extent that it seeks summary judgment dismissing Plaintiff's Eighth Amendment conditions-of-confinement claim against Sgt. Gifford.

*3. Retaliation Claims against Sgt. Gifford, C.O. Cuddeback, and C.O. Jayne*

"To state a First Amendment retaliation claim Plaintiff must establish '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.'" *Mitchell v. Annucci*, 2026 WL 828101, at *5 (N.D.N.Y. Jan. 29, 2026) (quoting *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2002)), *report and recommendation adopted*, 2026 WL 807178 (N.D.N.Y. Mar. 24, 2026). "Courts properly approach prisoner retaliation claims with skepticism and particular care, because virtually any adverse action taken by a prison official - even those otherwise not rising to the level of a constitutional violation - can be characterized as a constitutionally proscribed retaliatory act." *Id.* (quoting *Davis v. Goord*, 320 F.3d at 352).

Defendants do not dispute that Plaintiff satisfies the first prong of the test, *see generally* Defs.' Mem. of Law at pp. 20-24, and "[t]he Second Circuit has concluded that use of the prison grievance system constitutes protected activity." *Waters v. Melendez*, 2018 WL 3079764, at *10 (N.D.N.Y. May 18, 2018) (quotation omitted), *report and recommendation adopted*, 2018 WL 3069209 (N.D.N.Y. June 21, 2018),

*aff'd*, 783 F. App'x 56 (2d Cir. 2019). Defendants' entitlement to summary judgment thus turns on the remaining elements.

As to Plaintiff's retaliation claims based on C.O. Cuddeback and C.O. Jayne's misbehavior reports, Defendants argue that they can establish a non-retaliatory reason for adverse action taken against Plaintiff. Defs.' Mem. of Law at pp. 20-24. Specifically, they assert that C.O. Cuddeback and C.O. Jayne issued the misbehavior reports against Plaintiff based on their "firsthand observations and consistent with DOCCS policy" because Plaintiff did not follow direct orders. *Id.* In seeking summary judgment on Plaintiff's retaliation claim against C.O. Jayne, Defendants also contend that they would have taken action against Plaintiff even in the absence of Plaintiff filing a grievance against Sgt. Gifford. *Id.* at p. 23.

Disciplinary hearing dispositions filed by Plaintiff indicate that Plaintiff was found guilty of two of the three charges contained in C.O. Cuddeback's July 6 misbehavior report, including refusing a direct order and unauthorized religious garments. Dkt. No. 95-5 at pp. 54-55 & 58. Rather than disputing that he was wearing more than the maximum number of three religious beads, Plaintiff merely argues that a rule limiting the number of beads he can wear violates his religious rights. *See* Dkt. No. 95-3 at ¶¶ 13 & 18 (declaration stating that C.O. Cuddeback and C.O. Jayne "attempted to have [Plaintiff] take off [his] religious beads in excess of the three" and responding that his "religion called for the wearing of the religious Santeria beads"); *see also* Dkt. No. 95-5 at pp. 47-55 (testimony at disciplinary hearing arguing same).

Likewise, of the eight charges contained in C.O. Jayne's July 14 misbehavior report, Plaintiff was found guilty of two of them, including refusing a direct order and a movement regulation violation. Dkt. No. 95-6 at pp. 8-9. Again, the focus of Plaintiff's argument is not that he was innocent of these charges, but instead that C.O. Jayne had a retaliatory motive for issuing the misbehavior report. Dkt. No. 95-3 at ¶ 19 ("Jayne generated a false fabricated MBR against me, not because I refused to be pat-frisked, but rather, as a result of my complaining and filing grievances against both defendants Gifford and Cuddeback, each of whom work with defendant Jayne in south yard.").

Thus, Plaintiff does not dispute, and the evidence demonstrates, that he committed at least some, "if not all, of the prohibited conduct charged in the misbehavior report[s]" issued by C.O. Cuddeback and C.O. Jayne for which Plaintiff was found guilty, and thus Defendants have "met their burden of demonstrating proper, non-retaliatory reasons for filing the misbehavior report." *Hynes v. Squillace*, 143 F.3d 653, 657 (2d Cir. 1998). That Defendants had "legitimate non-retaliatory reason[s] for writing the misbehavior report[s] nullifies Plaintiff's claim." *Warren v. Bealey*, 2014 WL 4715863, at *8 (N.D.N.Y. Sept. 22, 2014).

Defendants do little to address the merits of Plaintiff's remaining retaliation claims based on Sgt. Gifford directing staff to confine Plaintiff to his cell for eight days in June 2022, and Sgt. Gifford and C.O. Jayne waving a copy of Plaintiff's grievance against Sgt. Gifford. As to the former claim, Defendants move for summary judgment on Plaintiff's First Amendment retaliation claims against Sgt. Gifford, but make no

specific argument as to why they are entitled to such relief. Defs.' Mem. of Law at p. 24. As to the latter claim, Defendants' argument rests entirely on the fact that "Plaintiff cannot . . . identify the date on which" that event took place. Defs.' Mem. of Law at p. 24. However, as noted by Plaintiff, that "plaintiff may not recall the exact date and time . . . does not take away the fact that the incident did in fact occur." Pl.'s Opp. at p. 8. Nevertheless, dismissal of Plaintiff's claim that Sgt. Gifford and C.O. Jayne waved a copy of Plaintiff's grievance against Sgt. Gifford is warranted because that conduct would not constitute adverse action. *See*, *e.g.*, *Barrington v. New York*, 806 F. Supp. 2d 730, 746 (S.D.N.Y. 2011) (finding that threat from officer "that 'me and my boys [sic] going to get you' while brandishing a copy of the grievance" was not adverse action).

The Court, therefore, recommends that Defendants' Motion be granted to the extent that it seeks summary judgment dismissing Plaintiff's First Amendment retaliation claims against C.O. Cuddeback and C.O. Jayne based on their misbehavior reports, and against Sgt. Gifford and C.O. Jayne based on them waving a grievance against Sgt. Gifford, but denied to the extent that it seeks summary judgment dismissing Plaintiff's First Amendment retaliation claim against Sgt. Gifford based on him directing staff to confine Plaintiff.

## V. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED**, that Defendants' Motion for Summary Judgment (Dkt. No. 68) be **GRANTED IN PART AND DENIED IN PART** as set forth above; and it is

further

**RECOMMENDED**, that Plaintiff's Cross Motion for Summary Judgment (Dkt. No. 95) be **DENIED** as set forth above; and it is further

**RECOMMENDED**, that Plaintiff's First Amendment retaliation claims (1) against C.O. Cuddeback and C.O. Jayne based on their misbehavior reports, as well as (2) against Sgt. Gifford and C.O. Jayne based on them waving a grievance against Sgt. Gifford, be **DISMISSED**; and it is

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days[4] within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human*

[4] If you are proceeding *pro se* and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. FED. R. CIV. P. 6(a)(1)(C).

*Servs.*, 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a).

Dated: August 17, 2026
Albany, New York

Daniel J. Stewart
U.S. Magistrate Judge